Laramore, Judge,
delivered the opinion of the court:
This is a suit for patent infringement. The Geffcken & Richter patent No. 1,898,046, hereinafter referred to as Geffcken, issued to plaintiff Radio Patents Corporation on February 21, 1933, and is now expired. Plaintiffs contend that claims 2,1,11,15,16, and 18 of the Geffcken patent have been infringed by certain electronic equipments used by defendant. Defendant contends that the patent claims in suit have not been infringed by the accused equipments and that the claims are not valid.
*617 The subject of the Geffcken patent is “Electric Relay Device for Indicating Weak Currents.” In general, this patent describes a cold cathode arc discharge relay device and circuits therefor. The technological principles involved may be briefly summarized as follows. Am electrical relay is a device for controlling a flow of electricity in response to some signal. Such relays include various types of electronic tubes operated to control the flow of a current of electrical particles, called electrons, through the tube. Electronic relay tubes may be gas-filled or may be evacuated. Gas-filled tubes contain some gas which when ionized provides a path for the flow of electricity. Such gas-filled tubes having three electrodes are commonly known as thyratrons. Evacuated electron tubes generally include thermionic means, such as a heated filament, to emit electrons which provide the path for the flow of electricity through the tube. An arc discharge is a luminous bow of light between two electrodes and passes a relatively high value of electric current at low voltages. A glow discharge is a luminous glow or haze between two electrodes and passes minute values of electric current at relatively high voltages.
Plaintiffs contend that the Geffcken invention comprised the using of a cold cathode and an external circuit which makes the cold cathode arc. Plaintiffs contend that such a system revolutionized the thyratron art. The several patent claims upon which plaintiffs rely define the precise scope of the alleged invention. It is the claim language which we must first consider. The claims in suit are set forth in full in the accompanying findings. Claim 2 recites an arc electrical relay device comprising a gas discharge tube, solid cathode and anode electrodes, and an auxiliary electrode between the main electrodes. The claim specifies that the main electrodes are connected to a source of energy too low to produce ionization and discharge, and also specifies means to impose an auxiliary potential on the auxiliary electrode and further means to impose a controlling potential on the auxiliary electrode, the latter controlling potential resulting in ionization and in arc discharge between the auxiliary electrode and the cathode which initiates a discharge between the main electrodes. Claim 7 is generally similar to claim 2 *618 and recites that the tube is glass and the electrodes fixed. Claim 7 does not specify an arc device but defines a device for switching considerable current which seems to us to imply an arc discharge type of device. Claim 15 is also similar to claim 2 and recites a vessel filled with a uniform gaseous atmosphere. Claims 11,16, and 18 recite electrical systems including input and output circuits. Claim 11 recites that the system includes high ohmic resistance in series with the main electrodes and a condenser in parallel with said electrodes. Claim 16 includes a reactance associated with the input circuit. Claim 18 adds potential means in the output circuit for alternately starting and stopping the electrical discharge.
Although plaintiffs urge that Geffcken relates to an electrical switch which turns current on and off, our consideration of the claim language indicates that the alleged invention is not that simple. The claim language is specific in pointing out the metes and bounds of the patent grant, and may not be broadened to cover a variety of different devices and systems used by defendant.
The accused thyratron controller used by defendant’s Department of the Air Force and illustrated diagrammatically in General Electric wiring diagrams, plaintiffs’ exhibits 2 and 3, is a complex circuit of apparatus for automatically controlling the azimuth and elevation of a turret in response to applied error signals. The thyratrons V107-V112 used therein are gas-filled tubes each having an anode, two grids, a cathode and a separate thermionic filament. Plaintiffs urge that use of tube V107 and its associated circuits infringes Geffcken claim 18. This claim specifically recites a potential means in the output circuit for alternately starting and stopping the electric discharge in said device and recites an electric reactance connected to the auxiliary electrode and to the input circuit to be charged. The accused controller is complex in that it utilizes a three-phase alternating current supply for producing rotation of azimuth and elevation motors in both directions of rotation. We are not able to find any basis for departing from our trial commissioner’s finding that this controller circuit does not respond to the *619 specific recital of claim 18, and likewise does not respond to the recital of other claims in suit. We note that tube V107, as well as numerous other thyratrons in the controller circuit, utilizes thermionic filaments in some instances as the tube cathode and in others the filament is separate from the cathode. In either case, it appears that a hot filament serves as an emitter of electrons and provides for circuit and tube operation of a character specifically different from the cold cathode type of operation disclosed by Geffcken and stressed by plaintiffs.
The accused Rawin elevation drive motor control circuit, plaintiffs’ exhibit 5, used by defendant’s Department of the Army, includes type 3023 thyratrons and associated circuitry. These tubes contain a mixture of an inert gas and mercury, and each tube has an anode, a control grid, and a filamentary thermionic cathode. Plaintiffs urge that use of such a tube and its circuit infringes Geffcken claim 15 which recites, among other limitations, that the tube (vessel) is filled with a uniform gaseous atmosphere. While the Geff-cken specification is silent as to the intended meaning of uniform gaseous atmosphere, we note that counsel in presenting this claim to the Patent Office argued that it is essential that the gaseous condition within the tube remain absolutely stable and uniform and that such operation cannot be obtained with mercury pool cathodes. We conclude that claim 15 is not infringed by defendant’s circuit utilizing thyratrons containing mercury and a hot filamentary cathode. We likewise conclude that the Rawin apparatus does not infringe the other claims in suit.
The accused Auxiliary Control Panel circuit, plaintiffs’ exhibit 10, used by defendant’s Department of the Navy, includes a relay tube, Western Electric 3130A, containing a cold cathode, two control electrodes, an anode, and described as a vacuum tube. A vacuum tube is a sealed tube with the contained gas exhausted to a pressure low enough to permit the passage of electric discharges between metallic electrodes therein. Plaintiffs urge that use of the 3130A tube and its circuit infringes Geffcken claim 2. This claim recites an arc discharge device including an auxiliary electrode between *620 the main electrodes and also recites auxiliary potentials and controlling potentials. Plaintiffs urge that tube 3130A is not a vacuum tube of the type disclaimed by plaintiffs at trial.[1] In objections to defendant’s requested findings, plaintiffs urged that the characteristics of the 3130A tube, shown in plaintiffs’ exhibit 20 for glow discharge operation, are such that the tube when used in defendant’s auxiliary control panel circuit might operate in arc discharge and would need to operate thus only once. It is our opinion that the accused panel circuit with tube 3130A does not respond to the specific recital of claim 2 in the manner urged by plaintiffs, and likewise does not respond to the specific recitals of the other claims in suit.
In reaching our conclusion that each of the several claims in suit is not infringed by any of the several currently accused thyratron tubes and associated circuits used by defendant, we have not been unmindful of the testimony of plaintiffs’ witnesses. Consideration of the statements of all witnesses with respect to operation of the several accused circuits and their component parts convinces us that the accused equipments do not include each and every element and applied potential specified in the claims in suit, and that such apparatus does not function to produce the same results as delineated in the Geffcken patent specification.
In view of the fact that we have concluded that the patent claims in suit have not been infringed by defendant, we need not pass upon the validity of the Geffcken patent. Noting that defendant has urged a number of prior patents and prior publications as invalidating the claims in suit, and has also urged invalidity based on alleged defects in and alleged in-operativeness of the Geffcken application disclosures, we find it unnecessary to consider such issues in our disposal of this litigation.
The petition is dismissed.
It is so ordered.
MaddeN, Judge; Whitaker, Judge, and Jokes, Chief Judge, concur.
*621 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Donald E. Lane, the briefs and the arguments of counsel, makes findings of fact as follows:
1. This is a patent suit under Title 28 U. S. C., Section 1498, for reasonable and entire compensation for the unlicensed use or manufacture by or for the defendant of certain inventions covered by ten United States Letters Patent. In a stipulation filed during the trial, plaintiffs restricted their charge of infringement to claims 2, 7, 11, 15, 16, and 18 of Geffcken & Bichter patent No. 1,898,046, hereinafter referred to as the Geffcken patent, issued February 21, 1938, to plaintiff Badio Patents Corporation, a corporation of New York.
2. Counsel for plaintiff Badio Patents Corporation also represented other plaintiffs at the trial of this case. The parties stipulated that certain rights in the Geffcken patent were sold to plaintiff Badio Corporation of America, and stipulated that plaintiff Badio Patents Corporation was a party to this suit when filed and was the true party in interest thereto.
3. The parties agreed to a separation of issues for trial, and that the issues of validity of the Geffcken patent and of infringement of the Geffcken patent by the defendant be first determined upon full proofs, findings of fact, and argument of counsel, and that any accounting issue be deferred.
4. The subject matter in suit involves electronics, and more particularly relates to gas-containing electronic tubes and circuits associated therewith. The subject of the Geffcken patent is “Electric Belay Device for Indicating Weak Currents”. The accused equipments are illustrated diagrammatically in drawings relating to auxiliary control panels, automatic tracking circuits, a resistance welding control, and a thyratron controller, all of which will be described more fully hereinafter.
5. Electronics is that branch of science and technology which relates to the conduction of electricity through gases or in vacuo. Several types of elementary electrical particles may enter into electronic conduction, but in all cases the *622 principal part of the electric current is believed to be made up of electrons. The electron is an elementary entity which possesses a negative electric charge. The corresponding entity possessing a positive charge is called a positive ion. Free electrons are caused to move by the attractive or repulsive forces exerted upon them by other electric charges in space or on electrodes ad j acent to the free electrons. There are two broad types of electronic tubes utilized for controlling the flow of a current of electrons. These are vacuum tubes and gas-filled tubes. Thermionic vacuum tubes employ thermionic means, such as a hot filament, to obtain electron emission. Such vacuum tubes have two or more electrodes and are often called radio tubes. Gas-filled electron tubes contain a gas or vapor, and generally utilize ionization of the gas to provide electrons to conduct a current from one electrode to another. Gas-filled electron tubes having three electrodes are now commonly known as thyratrons. Thyra-trons are characterized by having a much higher current-carrying capacity and lower voltage drop between cathode and anode electrodes, and by having a more limited control than thermionic vacuum tubes. A thyratron is a gas-filled electron tube in which a grid or control electrode provides limited control over the flow of a current of electrons from the cathode to the anode. A gas-filled three-electrode tube which employs a pool of mercury as a cathode is now called an ignitrón, and utilizes a luminous or cathode spot on the surface of the mercury pool to provide a source of emitted electrons.
6. Plaintiffs contend that the invention in suit involves an arc discharge between solid electrodes. Defendant urges that while the Geffcken original application disclosed an arc discharge in a circuit using a liquid mercury cathode, a circuit subsequently canceled, the application and resulting patent do not support plaintiffs’ present contention. An arc discharge is a sustained luminous bow of light between two electrodes and is characterized by the existence of relatively high current and low voltage values. A glow discharge is a luminous glow or haze between two electrodes and is characterized by relatively high voltage and minute current values. The voltage and current characteristics of a gas *623 discharge device are illustrated in the following curve from defendant’s exhibit 23, taken from a textbook printed in 1948.

In the above figure, the current values are plotted on a logarithmic scale. In the glow discharge region the voltage across the discharge gap is indicated as constant at about 125 volts and the current flow in milliamperes. When the discharge device snaps from the glow to the arc discharge region, the voltage drops to about 40 volts and the current increases to a range of 1 to 100 amperes.
7. The Geffcken patent in suit, plaintiffs’ exhibit 12, resulted from an application for letters patent filed in the United States Patent Office on November 12, 1924. The Geffcken patent issued February 21, 1933, containing twelve claims, and expired February 21, 1950. The specification of the issued patent reads as follows [all emphasis added] :
* * * Our invention relates to electric relay devices, and it has special relation to relays of the character described which may be actuated by extremely weak currents.
More particularly our invention contemplates the application of the well hnown phenomenon that an electric discharge or arc may be produced between two electrodes far more easily than usual if the gas between *624 the said electrodes is ionized. That is, an electric discharge between two electrodes, upon which a potential is impressed which is less than the normal potential necessary to cause an aro between said electrodes, may be initiated if the gas in the space between the electrodes is brought to an ionized condition. By making use of this phenomenon, we have been able to indicate or utilize extremely weak currents, since only very small quantities of energy are necessary in order to produce the required ionization.
Some of the workers in this art, for instance Zehnder, (see “Annalen der Physik”, Vol. 47, page 77 (1892); and Vol. 52, page 34 (1894)), have attempted to demonstrate the reception of Hertzian waves by producing an ionization between two spherical auxiliary electrodes, this ionization being effected by a low energy discharge produced by Hertzian waves. The ionization thus produced served to start a luminous discharge between two primary or main electrodes. In the demonstration made by Zehnder, however, the auxiliary electrodes were connected only with an oscillatory circuit, and it usually followed that in this oscillatory circuit, it was necessary to produce a potential which was substantially equal to the arcing potential of the auxiliary gas (this being about 200 volts) in order to initiate the luminous discharge between the main electrodes; this, of course, necessitated an appreciable amount of energy being used.
One of the main objects of our invention, therefore, is to arrange an arc or discharge tube with one or several auxiliary electrodes whereby the same may be practically used to indicate weak currents. We markedly reduce the energy which is to be used to initiate the arc or the discharge by applying an auxiliary potential to the auxiliary gap, this auxiliary potential being so adjusted that a low additional potential on this gap is sufficient to exceed the discharge voltage of the auxiliary gap. By thus initiating the auxiliary discharge, the aro between the main electrodes is started and this eventuates a current strong enough to operate any device, for instance, a relay.
We may, on the other hand, so practice our invention that the energy necessary for initiating the discharge may be still further reduced; that is, we may produce the ionizing auxiliary discharge between an auxiliary electrode and a main electrode, the latter being preferably the cathode.
*625 By practicing our invention in the above manner, and particularly by advantageously arranging the electrodes and the connections, we have succeeded m making a practicable relay device which will operate with a very weak current. Other advantages will, of course, be apparent when the following specification is read in connection with the accompanying drawing.
The accompanying drawing illustrates a number of embodiments of our invention, wherein:
Fig. 1 is a diagrammatic view of the circuits utilized when our invention is employed for receiving electric waves;
Fig. 2 illustrates the circuits as used when our invention is applied to a telegraph system; and
Fig. 3 illustrates the application of the invention for measuring purposes.

In Fig. 1 the auxiliary electrode Ip is arranged between the main electrodes 2 and 3 of the tube 1, it being noted that by this means the discharge potential of the auxiliary gap 3, Ip is markedly lower than that of the main gap 2,3. The direct current potential impressed on the auxiliary gap 3, Jp is derived from a potentiometer consisting of a thermionic valve 10 and a resistance member 11. By suitably adjusting the resistance of the member 11 and the plate current of the tube 10, the voltage between the electrodes 3 and Ip is adjusted to be just below the discharge potential of the gap betwen said electrodes. The oscillatory circuit 9 acts upon the grid of the valve 10 and is connected in such a manner that when energized by an antenna (not shown in the drawing) it causes the current from the valve to diminish, this latter being equivalent to increasing the voltage between the cathode and the plate of the valve. Through such a voltage increase, the discharge potential' of-the *626 auxiliary gap 3, 4 is attained and the relay starts as above indicated.
Here again an extremely weak current may be detected by starting the a'to between the main electrodes 2 and 3 and a device 7, such for instance as a Morse recorder, will be actuated. A circuit breaker 12, as shown in the circuit, acts to open the main circuit. When the energy of the antenna ceases to act upon the oscillatory circuit 9 the main discharge between electrodes 2 and 3 also ceases and is not started again until the voltage in circuit 9 is again built u~. In this connection, it is to be noted that the latter circuits will give the desired results only when the circuit breaker frequency is above that of the highest signal frequency. This application of our invention is especially useful in the reception of radiant energy.

Referring now to Fig. 2 our invention is illustrated as being used with a telegraph system. In this figure, the n~ain circuits whereby the electrodes 2 and 3 are energized, include a high resistance member 13 an4 a condenser 14 which shunt the tube .7, the key 15 being connected to telegraph wires. The telegraph wire connected to the auxiliary electrode 4 is at substantially ground potential, and since the battery 8 is grounded at 19, a direct current voltage is impressed upon the auxiliary gap 3, 4, which may be just below the discharge potential of said gap. Even if the telegraph wires have a very high resistance (that is 100000 ohms) the weak current, which passes upon the closing of the key 15, is sufficient to increase the voltage of the auxiliary electrode 4, and said voltage attains the discharge potential of the auxiliary gap 3, 4. When the main discharge between the electrodes 2 and 3 is thus started, the condenser 14 discharges through a telephone, diagrammatically *627 represented at 16. Because of the high resistance, however, the discharge cannot be maintained and the arc fails to be re-started until the condenser becomes recharged up to a certain value of voltage. This latter character of interrupters is of considerable value if used in connection with the relay of our invention.
By thus applying our invention mechanical interrupting devices are not necessary. Moreover, through the proper arrangement and selection of the constants of the circuits, a sound may be observed in the telephone 16.
As before intimated, our invention is adapted not only to indicate weak currents, but, moreover, to measure the same.

. In Figure 3, we have diagrammatically illustrated a circuit for effecting such, measurement of weak currents. The arrangement is very much like that of Fig. 2 with the addition that a condenser 17 is placed in the circuit of the auxiliary or initiating discharge electrode. A radio-active tube is represented at 18, that is a gas filled tube with two plate electrodes, one of which is treated with a radio-active compound. Such a tube allows only an extremely weak current to pass. In Fig. 3 this current charges the condenser 17 until the potential of the auxiliary gap 3, Ip exceeds the discharge voltage thereof, whereupon a weak discharge passes said gap and serves to initiate a heavy discharge between the main electrodes % and 3. This latter arc, however, is automatically, interrupted, as above indicated. It is our experience that after the interruption of the discharge, the potential of the auxiliary electrode ^ remains at a value which is just below that normally required to cause a discharge to pass the auxiliary gap. Consequently a low additional charge on the condenser 17, caused by the extremely weak *628 currents passing the radio-active tube 18, is sufficient to re-establish the discharge potential of the auxiliary electrode If, and the discharge phenomenon periodically repeats, the frequency of the same increasing as the ionization current from the tube 18 increases and this frequency again increasing if the capacity of the condenser 17 diminishes. As the frequency of the current pulsations becomes greater, the average intensity of the current in the main electrode circuit increases. Such an increase can be measured by a device 7 which may, for instance, comprise an integrating meter for measuring such average values. As before pointed out, such measurement is only possible if at the moment of arcing the main electrodes have attained a sufficiently high potential.
It is necessary, therefore, in practicing our invention to choose the frequency of interrupting the main electrode circuit to thereby secure a frequency higher than the arcing frequency.
While we have described several embodiments of our invention, it will be apparent that those skilled in the art may make many changes therein without departing from the spirit and scope of the appended claims.
Having described our invention, what we claim as new and desire to secure by Letters Patent of the United States, is: * * *
8. The Geffcken patent claims in suit read as follows:

Claim 2

An arc electrical relay device for switching considerable current by extremely weak current, comprising
a gas discharge tube,
solid cathode and anode electrodes situated therein,
an auxiliary electrode between said main electrodes and influencing their electric field,
said main electrodes being connected to a source of energy supply of too low a value normally to produce ionization and start a discharge therebetween
means for imposing an auxiliary potential upon said auxiliary electrode
further means for imposing controlling potential upon said auxiliary electrodes,
said auxiliary potential being of such value that upon the imposition of a low additional controlling potential the tube becomes ionized and a low voltage arc discharge occurs between said auxiliary electrode and the cathode,
*629 thus initiating the discharge between said main electrodes.

Claim 7

In an electric relay device for switching considerable current by extremely weak current, comprising a glass tube filled with a gaseous atmosphere, solid and fixed cathode and anode electrodes situated within said tube to form a discharge gap, an auxiliary electrode within said tube arranged intermediate said cathode and said anode to form an auxiliary discharge space together with said cathode, said cathode and anode being connected to a source of controlled energy supply of too low a value normally to ionize said gap and produce a discharge therebetween, means for imposing biasing potential upon said auxiliary electrode, means for imposing further controlling potential upon said auxiliary electrode, said biasing potential being of such value that, upon the further imposition of an extremely weak controlling potential upon said auxiliary electrode, an ionizing discharge of said auxiliary space is started initiating the mam discharge between said cathode and said anode.

Claim 11

In an electrical system comprising an input circuit carrying weak controlling currents, an output circuit to carry heavy controlled currents, a discharge tube filled with a gaseous atmosphere including solid main electrodes, a source of operating potential inserted in said output circuit of too low a value normally to produce ionization and start a discharge between said main electrodes, an auxiliary electrode connected to said input circuit to form an auxiliary discharge gap with one of said main electrodes, means for imposing a biasing potential upon said auxiliary electrode, further means for imposing a controlling potential upon said auxiliary electrode, said biasing potential being of such a value that, upon the further imposition of an extremely low additional controlling potential, an ionizing discharge occurs at said auxiliary gap initiating the discharge between said main electrodes, a high ohmic resistance in series with said electrodes and a condenser connected in parallel to said main electrodes.

Claim 15

In an electrical relay device comprising a vessel filled with a uniform gaseous atmosphere, solid main electrodes within said vessel, an auxiliary electrode within *630 said vessel, sources of operating potential and biasing potential for said main electrodes and for said auxiliary electrode, respectively, further means for applying controlling potential upon said auxiliary electrode said operating and biasing potentials being of such value that normally substantially no ionization is produced of said atmosphere, and said biasing potential being further of such value, that with the imposition of a low additional controlling potential ionization is started and a low voltage aro discharge is initiated between said main electrodes.

Claim 16

In an electrical system comprising an input circuit-carrying weak controlling currents; an output circuit to carry heavy controlled currents; a gaseous discharge tube including solid' main electrodes inserted in said output circuit; an auxiliary electrode within said device connected to said input circuit; sources of operating potential and biasing potential for said main electrodes and said auxiliary electrode, respectively; further means for applying controlling potential upon said auxiliary electrode, said operating and biasing potentials being of such value that normally substantially no ionization is produced within said tube and said biasing potential being further of such value that with the imposition of a low additional controlling potential ionization is started and a low voltage aro discharge initiated between said main electrodes; an electric reactance associated with said input circuit and connected to said auxiliary electrode to be electrically charged by the controlling currents in said input circuit to produce controlling potential upon said auxiliary electrode for initiating a discharge between said main electrodes.

Claim 18

In an electrical system comprising an input circuit carrying weak controlling currents; an output circuit to carry heavy controlled currents; an electrical discharge device filled with a gaseous atmosphere; main electrodes situated within said device and connected in said output circuit; potential means in said output circuit for alternately starting and stopping the electric discharge in said device; an auxiliary electrode within said device; said input circuit being connected to said auxiliary electrode; and an electric reactance connected to said auxiliary electrode and to said input circuit to be charged by the controlling currents in said input *631 circuit for producing input potential upon said auxiliary electrode for controlling the electrical discharge of said device.
9. Claim 1 differs from claim 2 by reciting that the tube is glass, that the electrodes are fixed, that the auxiliary electrode forms an auxiliary discharge space with the cathode, and that the potential imposed on said auxiliary electrode is a biasing potential. Claim 11 recites an electrical system including input and output circuits for the discharge tube, and recites a high ohmic resistance connected in series with the main electrodes and a condenser connected in parallel with said electrodes. Such a resistance and condenser are disclosed in the figure 2 circuit of the Geffcken patent. Claim 15 is like claim 2 but recites a uniform gaseous atmosphere in the discharge vessel, sources of operating and biasing potential, and that by the imposition of a low additional controlling potential ionization is started and an arc discharge initiated. Claim 16 is similar to claim 11 but recites an electric reactance associated with the input circuit. Such a reactance is disclosed as condenser 17 in the figure 8 circuit of the Geffcken patent. Claim 18 is similar to claim 16 but adds potential means in the output circuit for alternately starting and stopping the discharge. Automatic self-interrupting output circuits are disclosed in figures 2 and 3 of the Geffcken patent. Claims 2, 15, and 16 specify a low voltage arc discharge between electrodes.
10. Plaintiffs urge that the Geffcken claims in suit relate to arc discharge devices and their control circuits, as distinguished from glow discharge devices, and contend that the Geffcken application for letters patent as originally filed supports such contention. The original Geffcken, et al. specification and claims were filed in the United States Patent Office- on November 11, 1924. Geffcken and Richter were research physicists well known in the German electrical industry, and their names appear on numerous United States Letters Patent. Their original application for the patent here in suit, executed by them before a United States consul, does not describe the three circuits illustrated in the issued patent as involving an arc discharge. The original application did describe a different circuit utilizing a liquid mercury *632 vapor tube as operating with arc discharge, but this circuit and its description were later canceled from the application. The three circuits shown in the issued patent were first described as operating with an arc discharge when patent counsel rewrote the Geffcken and Richter specification and filed a substitute specification on March 18,1925. No supplemental oath executed by Geffcken and Richter was ever filed to support and approve the substituted specification. In describing the circuits of figures 1, 2, and 3 of the patent in suit, for operation by arc discharge, the unsupported substitute specification constituted new matter. Defendant’s fully qualified technical expert testified that the circuit of figure 1 of the patent in suit operated with a glow discharge as distinguished from an are discharge. Geffcken and Richter German patent 527,045 contains circuit illustrations identical with figures 1 and 2 of the patent in suit and refers to the discharge tube as a glow discharge tube. Geffcken and Richter German patent 506,861 contains a circuit illustration identical with figure 3 of the patent in suit and relates to relay connections with three electrode glow■ discharge tubes. It is noted that the original Geffcken and Richter specification and claims were amended in the Patent Office on 11 separate occasions, and that patent counsel presented 59 claims for Patent Office consideration before obtaining allowance of the claims here in suit. The record of the Geffcken application in the Patent Office comprises some 121 pages, and is incorporated herein by reference only (defendant’s exhibit 1). Said record does not support plaintiffs’ contention that the Geffcken patent application as filed discloses that the devices of figures 1,2, and 3 of the patent were or are aro discharge devices. An arc discharge from a solid metal cathode tends to consume the cathode. An arc discharge from a pool of liquid mercury does not consume the cathode as the vaporized mercury condenses and returns to the pool. The disclosure of the Geffcken patent is inoperative to the extent that the specification and drawings fail to teach how to secure practical aro discharge type of tube conduction. Plaintiffs’ expert stated that Geffcken was the -first to make the cathode large enough so that consumption of the cathode by the arc would not make it a 10-minute *633 device. Neither the Geffcken original application nor the resulting patent specifies anything concerning cathode size.
11. The Geffcken application as filed and the patent which issued thereon do not disclose specific details of the discharge devices or of the various circuit components illustrated diagrammatically. There was no disclosure by Geffcken, et al. of possible size or spacing of electrodes, no disclosure of suitable gas pressures, and no disclosure of any values for the various imposed potentials, resistance, capacity and reactance devices. The disclosure of the Geffcken patent was inadequate to teach a person possessed of ordinary skill in the electronic art in 1933 how to make practical use of the circuits and devices diagrammatically illustrated, described and claimed therein.
12. The eight claims presented in the original Geffcken, et al. application for letters patent were all directed to an electric relay device for indicating weak currents. Said claims were all canceled during prosecution of the application in the United States Patent Office. During said prosecution, no supplemental oath or affirmation by the applicants was ever filed to specifically cover the present patent claims directed to relay devices for switching considerable or heavy current. The expressions switching considerable cv/rrent and hea/oy controlled currents used in the patent claims in suit were not disclosed or used in the original Geffcken, et al. specification and claims filed November 11. 1924, and were not disclosed or used in the substitute specification and claims filed March 18,1925. The expression switching considerable current was first used in the Geffcken, et al. application in claims submitted by an amendment filed May 27, 1927, said to follow “lengthy correspondence with the inventors abroad”.
13. The Geffcken application of patent as originally filed stated:
It is the main object of our invention, to make the discharge tube with one or several auxiliary electrodes adapted for practical technical use in order to indicate weak currents. * * *
* * * * # ' ‘
The accompanying drawing illustrates certain, embodiments of the invention which will now be described,. *634 it being understood that the invention- is susceptible of embodiment in various other forms.
The drawing accompanying the application as originally filed included five figures illustrating diagrammatically five different embodiments. Original figure 1 disclosed an alarm or signal releasing circuit including a mercury vapor arc tube filled with gas and having two auxiliary electrodes. Original figure 2 disclosed an alarm circuit including a luminous discharge tube filled with rarefied neon gas and having a single auxiliary electrode beside the anode. These original figures 1 and 2 do not appear in the Geffcken patent as issued. Original figure 3 is now figure 1 of the patent and disclosed a recorder control circuit including a tube having an auxiliary electrode between the main electrodes. Original figure 4 is substantially figure 2 of the patent and disclosed a telegraph circuit including a tube like that of the preceding figure. Original figure 5 is figure 3 of the patent and disclosed a circuit to measure weak currents, the circuit including a tube like that of the preceding two figures. It is a reasonable assumption that at the time the original application for patent was filed, the joint inventors considered the various tubes and the various circuits of the five different embodiments illustrated and described to be equivalents in illustrating their claimed invention. It is likewise a reasonable assumption that the inventors did not intend to limit their invention claims to a single tube construction or to a single electrical circuit. The recorder control circuit disclosed in figure 1 of the Geffcken patent is a circuit for receiving radio waves. The parties have stipulated that plaintiffs herein claim no compensation from the defendant for any equipment in the fields of radio purposes.
ACCUSED STRUCTURES
14. The equipments used by defendant and alleged by plaintiffs as infringing one or more of the six patent claims in suit are illustrated by certain circuit diagrams and manuals furnished by the defendant in response to plaintiffs’ motions for call. The items on which plaintiffs rely are identified as follows:
*635 A. Thyratron Controller — G. E. drawing 7034-Ell entitled “Schematic-Electrical for Thyratron Controller 7031E54,” dated in 1951, furnished by Department of the Air Force, and marked plaintiffs’ exhibit 2;
B. Rawin Set AN/GMD-1 — Army Technical Manual TM 11-271, dated in 1950, pages 117-126 inclusive, furnished by Department of the Army, and marked plaintiffs’ exhibit 5;
C. Auxiliary Control Panel — BuOrd drawings 352925 (1954), TP-79562 (1945), and 582268 (1945), furnished by Department of the Navy, and marked plaintiffs’ exhibit 10;
D. Resistance Welding Control — Westinghouse drawing 48-J-963, entitled “Resistance Welding Control Synchro-Trol Type S3H Composite Schematic Diagram”, dated in 1946, furnished by Department of the Navy, and marked plaintiffs’ exhibit 11.
The plaintiffs claim no compensation for any equipment manufactured by or procured by defendant from American Telephone and Telegraph company, its subsidiaries or companies of the Bell System, or for any equipment manufactured by plaintiff Radio Corporation of America or its subsidiaries, or for any equipment in the fields of radio purposes.
15. The schematic electrical diagram for the Air Force thyratron controller 7031E54 discloses a complex multitube circuit for a portion of an apparatus for controlling the azimuth and elevation of a turret in response to applied error signals. Among the thirty or more tubes illustrated in this diagram is a power thyratron designated V 102. Plaintiffs contend that this tube and its associated circuits infringe the patent claims in suit. The thyratron Y 102 is a gas-filled tube having an anode, a control grid, and a filamentary thermionic cathode. The circuits connected to tube Y102 include a transformer T9S1 and a rectifier GB106 for applying a negative bias direct current voltage to the control grid. A transformer secondary T102S responsive to an error-correcting signal changes the bias voltage on the control grid and thereby alters the conductivity of tube V102. The transformer primary T10&P is connected to the output of a thyratron VI08 which in turn is responsive to an error signal applied at a connection J55-A. The full circuit is complex in that the thyratrons V107, V108 and *636 ¥109 control thyratrons ¥101, Y 102 and V10S for controlling a three-phase alternating current supply producing motor armature rotation in a negative direction, and six more thyratrons, YlOfy, V105, ¥106, ¥110, ¥111 and ¥11%, are connected for controlling rotation in a positive direction. Various resistances and condensers are included in the circuit. The Y101-Y106 thyratrons (type 6044) each have an anode, one grid, and a thermionic filament cathode. The Y107-Y112 thyratrons (type 5757) each have an anode, two grids, a cathode, and a separate thermionic filament. A three-phase source of 400 cycle alternating current voltage has one phase connected to the anode of tube ¥102. An Air Force employee testified that tube ¥102 goes into conduction at each cycle of positive alternating current on its anode. The particular circuits illustrated in the Geffcken patent drawings are not connected for controlling the passage of the phases of three-phase alternating currents. The evidence is inconclusive as to whether or not the source of energy supply to tube ¥102 is of too low a value normally to produce ionization and start an arc discharge in said tube. The evidence is also inconclusive as to whether or not the bias voltage on the grid of tube ¥102 is of such a value that upon imposition of a low additional controlling potential the tube ¥102 becomes ionized and a low voltage arc occurs between the grid and the cathode. Claim 2 of the patent in suit is not infringed by the equipment shown in Air Force thyratron controller 7031E54, as illustrated in plaintiffs’ exhibit 2. The evidence is also inconclusive as to whether the thyratrons in the Air Force controller have an auxiliary electrode arranged to form an auxiliary control space together with the cathode and whether there is an ionizing discharge in such an auxiliary discharge space as recited in claim 7. The controller thyratrons are not provided with a condenser in parallel with the main electrodes as recited in claim 11. The evidence is also inconclusive as to whether the controller thyratrons have a uniform gaseous atmosphere as recited in claim 15, or have an electric re-actance associated with an input circuit as recited in claim 16, or have potential means in the output circuit for starting and stopping a discharge in the device as recited in claim 18. *637 Claims 7, 11, 15, 16, and 18, like claim 2, of the patent in suit, are not infringed by the equipment illustrated in plaintiffs’ exhibit 2.
16. The schematic diagram of the Bawin apparatus elevation drive circuit, figure 133, page 122, Army Technical Manual TM 11-271, plaintiffs’ exhibit 5, provides for the control of the flow of current to the stator windings of a reversible, split stator, direct current motor. The circuit includes an elevation drive motor B-201, two driver tubes marked V-603 and V-60Jp and identified as type 3C&3 thyra-trons, and associated circuit components. The technical manual describes the operation of these tubes as follows:
* * * Tubes V-603 and V-60Jp are negative control thyratrons. These tubes conduct when the grid voltage rises above the critical value determined by the minimum plate-to-cathode voltage that can maintain ionization in the tubes. This plate-to-cathode voltage is called the extinguishing voltage and is independent of the grid voltage. Conduction occurs when the plate-to-cathode voltage drops below the value of the extinguishing voltage. Once the critical value of grid firing potential is exceeded, the gas in the tube (a mixture of inert gas and mercury vapor) ionizes, and the grid no longer controls the flow or magnitude of the current. Current flows, regardless of the value of the existing grid voltage after conduction starts, until the plate-to-cathode potential drops below the value necessary to maintain ionization in the tube. Therefore, the grid acts as a switch which starts or prevents current flow in the thy-ratron plate circuit, depending on whether the grid voltage is above or below the critical value. * * *
The thyratrons V-603 and V-60Ip are tubes containing a mixture of inert gas and mercury. Each tube has an anode, a control grid and a filamentary thermionic cathode. The thyratron motor control circuit is utilized in a direction-finder apparatus to cause a motor to move an antenna so as to track a signal being transmited by a remote radio transmitter of weather data. When the receiver antenna is directly in line with the transmitting antenna no error signal is developed and the thyratrons of the motor control circuit are in a non-conducting condition. The evidence is inconclusive as to whether the bias voltage on the control grid *638 of thyratron V-603 or V-604 is of such a value that upon imposition of a low additional controlling potential a low voltage arc occurs between the control grid and the thermionic cathode. Claim 2 of the patent in suit is not infringed. The evidence is also inconclusive as to whether the tubes are glass, whether the control grid is arranged to form an auxiliary discharge space together with the cathode, and whether there is an ionizing discharge in such an auxiliary discharge space, as recited in claim 7. The Rawin elevation drive circuit does not include a condenser in parallel with the main electrodes as recited in claim 11. The evidence is inconclusive as to whether the inert gas and mercury in the Rawin circuit thyratrons provided a uniform gaseous atmosphere as recited in claim 15. It is likewise uncertain whether the Rawin circuit includes an electric reactance associated with an input circuit and connected to an auxiliary electrode as recited in claim 16, or includes potential means in the output circuit for alternately starting and stopping an electric discharge as recited in claim 18. Claims 2, 7, 11, 15,16, and 18 of the patent in suit are not infringed by the Army Rawin elevation drive circuit as illustrated in plaintiffs’ exhibit 5.
17. Navy Auxiliary Control Panel Schematic wiring diagram, illustrated on drawing 352925 of plaintiffs’ exhibit 10, includes a vacuum tube V19 associated with five multi-contact relays, two condensers, two resistances, and numerous terminals. Tube V19 is identified on related drawing 582268 of the exhibit as being a Western Electric 313GA vacuum tube. This tube is described in plaintiffs’ exhibit 20 as a double gap, cold cathode, gas-filled tube for use as a relay, and as having two similar control electrodes, one anode, and a glass bulb. A Navy employee testified that tube V19 probably contained mercury vapor and neon, argon or xenon gas, and that there is no ionization and arc discharge until a sufficient potential is superimposed on the bias potential on the control electrode of the tube. Said employee also testified that the capacitor 081 connected across the cathode and grid electrodes may be used as a delay in building up a voltage to fire the tube. The wiring diagram indicates that a discharge between main electrodes 1 and 0 of tube VI9 causes energization of the solenoid of relay DO. No potential *639 means in the output circuit for alternately starting and stopping the electric discharge are illustrated in exhibit 10. The evidence is inconclusive as to the nature of the other circuits or apparatus with which the relay circuit of plaintiffs’ exhibit 10 was used. There is no evidence as to the value or values of any potentials connected to the numerous terminals. The evidence is inconclusive as to whether the Navy Auxiliary Control Panel Schematic circuit operates in the manner specifically recited in claims 2, 7, 11, 15, 16, and 18 of the patent in suit. Said claims are not infringed by said Navy circuit.
18. The Navy Resistance Welding Control, Synchro-Trol Type S3H Composite, illustrated by schematic diagram 48-J-963, plaintiffs’ exhibit 11, includes a thyratron control tube 1/FTJ and associated components near the bottom right corner of said diagram. The exhibit indicates that tube 1¡TÜ is type WL-67%, and that it is a gas-containing tube having an anode, a control' grid, a cathode heated by a thermionic filament, and also having a second grid electrode, the latter being connected to the cathode. The tube Jfl'TJ is connected with a network of resistances, capacitors, and transformer secondaries which apply a potential to the grid electrode between the cathode and the second grid electrode. A Navy employee testified that the bias potential applied to the control electrode of tube J¡TU came from a resistor 9B or JOB, and that an additional signal to raise the control electrode to the firing point came through transformer STS. The exhibit indicates that the potential' across terminals O and D of transformer 5TS is 230 volts and that the potential across terminals G and H of transformer STS is 60 volts. The evidence is inconclusive as to whether thyratron J/TU is caused to fire by imposition of a low additional or an extremely weals controlling potential upon an auxiliary potential already imposed on the control or grid electrode as recited in the several claims in suit. Plaintiffs urge that exhibit 11 welding control circuit infringes claims 16 and 18 of the patent in suit. Thyratron JflTJ does have a capacitor of .001 microfarad value connected to the auxiliary or grid electrode, as do other thyratrons in the control circuit. The evidence is inconclusive that such a capacitor produces *640 a controlling potential for initiating a discharge across the main electrodes as defined in claims 16 and 18. Claims 2, 7, 11, 15, 16, and 18 of the patent in suit are not infringed by the Navy resistance welding control circuit illustrated in plaintiffs’ exhibit 11.
19. At the trial of this case, plaintiffs’ counsel stated that he represented all four plaintiffs. In an opening statement relating the development of the patent in suit, counsel for plaintiffs stated:
* * * The mercury pool type of switches would not solve his [Geffcken’s] problem and so he proceeded with an investigation of this problem and he finally evolved in his laboratories an arc discharge tube which has now come to be known as a thyratron, in which he did the following: He [Geffcken] said: “I cannot, with my knowledge of cathode filamentary devices, use a hot cathode because they will be very seriously destroyed by an arc.” So, he did a thing which was startling at the time, he said: “I will use a cold cathode. If I use a cold cathode I have certain obvious disadvantages, that is, it will not emit electrons nearly as well as a hot cathode. It will require a greater operating potential at the anode, but it has at least the great advantage that it gets me started, gets me going in the right direction, it gets me away from the mercury pool which is pointed this way, I am going toward a solid cathode which is in that direction and which I now will find a tremendous field of usefulness for.” * * *
The specification of the Geffcken patent in suit does not teach the use of a hot cathode or a thermionic filament type cathode. Accused circuits such as the Air Force thyratron controller, the Army Rawin Set, and the Navy resistance welding control, each utilizing thyratrons having thermionic filaments providing a hot cathode, do not infringe the claims of the patent in suit upon which plaintiffs rely.
20. Plaintiffs’ counsel also stated at the trial—
* * * Now, we have a fundamental serious distinction between gas discharge tubes and vacuum tubes. I have already pointed out that in a vacuum tube the amount of current flowing is very much limited because of negative space charged around the cathode, and in a gas-filled tube we are going to have because of the ionized condition a much greater number of electrons which can reach the anode. It is a very important dis *641 tinction and, therefore, makes the thyratron or gas tube desirable as a switching device. * * *
The accused Navy Auxiliary Control Panel circuit utilizes a tube described as a vacuum tube and does not infringe the Geffcken patent claims in suit.
21. Summarizing, claims 2,7,11,15,16, and 18 of Geffcken & Richter patent No. 1,898,046 are found to be not infringed by any of the several circuits designated by plaintiffs.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is therefore dismissed.

 Note finding 20.